UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATERPILLAR FINANCIAL SERVICES CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>CHARTER CONNECTION CORPORATION, *in Personam*, et al.,<br><br>    Defendants<br>_____<br><br>AND RELATED CROSS-CLAIM AND COMPLAINT IN INTERVENTION<br>_____ | Civil No. 07cv767-L(NLS)<br><br>**ORDER GRANTING CATERPILLAR FINANCIAL SERVICES CORPORATION'S MOTION FOR SUMMARY ADJUDICATION OF A.K. SUDA, INC.'S CLAIM FOR A MARITIME LIEN AND DENYING A.K. SUDA'S CROSS-MOTION ON THE SAME CLAIM** |

In this admiralty action, Plaintiff Caterpillar Financial Corporation ("Caterpillar") filed a motion to dismiss A.K. Suda, Inc.'s ("Suda") first cause of action for a maritime lien against the vessel Belle Amie. For the reasons stated below, Caterpillar's motion to dismiss is treated as a motion for summary adjudication. Suda opposed the motion and filed a cross-motion for summary adjudication of the same cause of action. For the reasons which follow, Caterpillar's motion is **GRANTED** and Suda's motion is **DENIED**.

Caterpillar brought this action pursuant to 46 U.S.C. §§ 31322 and 31325 against the Belle Amie *in rem*, Charter Connection Corporation ("Charter") *in personam*, and guarantors

/ / / / /

/ / / / /

Pete and Pamela Terrebonne[1] *in personam* to collect amounts due under its preferred ship mortgage. Suda intervened in the action alleging it had a maritime lien for necessaries. Suda claims the lien is based on the engineering and design services it performed for the Belle Amie prior to Caterpillar's mortgage, and seeks to recover over $479,000 plus interest, costs and fees against the same vessel.

Caterpillar argues the maritime lien claim should be dismissed for lack of admiralty jurisdiction because the subject matter of Suda's underlying contract was to provide design and engineering services for construction of a vessel and not to a completed vessel, and was therefore not a maritime contract. In its opposition and in support of its own motion for summary adjudication, Suda argues that admiralty jurisdiction exists for its maritime lien claim and that the claim should be summarily adjudicated in its favor because it meets the requirements for a statutory maritime lien.

Although Caterpillar's motion was filed as a motion to dismiss, it is converted to a motion for summary adjudication. Caterpillar's motion does not rest on the allegations in Suda's complaint, but instead relies on the declaration of Michael E. Thompson and attached exhibits to argue for dismissal. *See* Fed. R. Civ. Proc. 12(d). Because Caterpillar's motion was supported by an affidavit and Suda cross-moved for summary adjudication of the same claim, both parties had a "reasonable opportunity to present all the material that is pertinent to the motion." *See id*.

Furthermore, where, as here, "jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits, the trial court should employ the standard applicable to a motion for summary judgment." *Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 305 F.3d 913, 922 (9th Cir. 2002). "[T]he Maritime Lien Act enumerates the elements required for *both* a valid necessaries lien and the right to enforce that lien in admiralty." *Id*. Where the Maritime Lien Act inextricably intertwines the questions of subject matter jurisdiction and the

---

[1] Caterpillar has since dismissed Defendants Pete and Pamela Terrebonne based on their bankruptcy filing and the resulting stay. (*See* Notice of Voluntary Dismissal of Defendants Peter Terrebonne and Pamela Terrebonne, filed May 15, 2007.) Suda is no longer pursuing any relief against the Terrebonnes or Charter. It is only proceeding against the Belle Amie *in rem*. (Suda's Mem. of P. & A. in Supp. of Mot. for Partial Summ. J. at 3.)

claim for relief, both questions are considered according to the standards applicable on summary judgment. *See id*.

Federal Rule of Civil Procedure 56(c) empowers the court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

In this case, the parties filed cross-motions regarding Suda's claim for a maritime lien. The mere fact the parties filed cross-motions "does not necessarily mean there are no disputed issues of material fact and does not necessarily permit the judge to render judgment in favor of one side or the other." *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir. 1975). "[E]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

Each moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id*. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

Suda bears the burden of proof at trial on its maritime lien claim. Accordingly, on Caterpillar's motion, Caterpillar as the moving party can meet its burden by pointing out the absence of evidence from the nonmoving party. It need not disprove Suda's case. *See Celotex*, 477 U.S. at 325; *see also Garneau v. City of Seattle*, 147 F.3d 802, 807 (9th Cir. 1998).

In contrast, Suda bears a heavier burden as the moving party on its own cross-motion. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the

absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

If the movant meets his burden, the burden shifts to the nonmovant to show summary adjudication is not appropriate. *Celotex*, 477 U.S. at 317, 324. The nonmovant does not meet this burden by showing "some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant must go beyond the pleadings to designate specific facts showing there are genuine factual issues which "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

In considering the motion, the nonmovant's evidence is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. Determinations regarding credibility, the weighing of evidence, and the drawing of legitimate inferences are jury functions, and are not appropriate for resolution by the court on a summary judgment motion. *Id*. Furthermore, on cross-motions, the court must consider evidence submitted in support of and in opposition to both motions before ruling on either one. *Fair Hous. Council*, 249 F.3d at 1136.

The substantive statute underlying Suda's claim is the Maritime Lien Act. Under the act, "a person (1) providing necessaries (2) to a vessel (3) on the order of the owner or a person authorized by the owner has a necessaries lien on the vessel and may bring a civil action in rem to enforce that lien." *Ventura Packers*, 305 F.3d at 922; *see also* 46 U.S.C. § 31342. Caterpillar disputes whether Suda could establish any one of the three elements for a necessaries lien.

As to the "vessel" element, the issue is whether Suda's services were rendered for the construction of the Belle Amie.[2] Each party takes a different approach to the definition of "vessel." Caterpillar relies on the line of cases starting with *Thames Towboat Co. v. The Francis McDonald*, 254 U.S. 242 (1920) ("*The Francis McDonald*"). *The Francis McDonald* is a seminal maritime lien case on the issue whether necessaries were furnished to a vessel or for

---

[2] Because the issue is whether the Belle Amie was a completed vessel or was still under construction when Suda rendered its services, the court intends to avoid using conclusory terms such as "vessel" when referring to the Belle Amie. Instead, the court refers to it as the Belle Amie regardless of its state of completion. To the extent the term "vessel" is used in the discussion of the case, it is not intended to presuppose the outcome.

construction of a vessel. It held that maritime jurisdiction to enforce a necessaries lien was lacking when services were rendered for vessel construction. On the other hand, Suda relies on *Stewart v. Dutra Construction Company*, 543 U.S. 481 (2005), a Jones Act case which is similar to the case at hand in that the pertinent statute did not provide a definition of "vessel." *See id*. at 488-89. However, *Stewart* did not address the issue of vessels under construction. Relying on *Stewart*, Suda argues the proper definition is provided in the Revised Statutes of 1873. *See id.* at 489.

The Ninth Circuit has not addressed the issue which line of authority should be followed. The issue has been recently resolved by the Fifth Circuit in *Cain v. Transocean Offshore USA, Inc.*, 518 F.3d 295 (5th Cir. 2008). *Cain* held that *Stewart* was not "intended to apply to watercraft that are still under construction" and did not change the body of law, starting with *The Francis McDonald*, which held that "a structure under construction remains a non-vessel until it is complete and ready for duty upon the sea." 518 F.3d at 300, 301. Finding the reasoning of *Cain* persuasive, the court follows *The Francis McDonald* line of authority.

In *The Francis McDonald*, the owner contracted with a shipbuilding company for construction of a schooner. The shipbuilding company constructed only the hull and was unable to complete the project. The owner then agreed with the plaintiff to complete the construction and had the hull towed to the plaintiff's shipyard. The plaintiff performed some construction services and furnished materials. The Francis McDonald was subsequently towed to another shipyard and finished by a third party. 254 U.S. at 243. In an action to enforce the plaintiff's maritime lien for the work and materials, the court applied the rule that "a contract for the complete construction of a ship or supplying materials therefor is nonmaritime, and not within the admiralty jurisdiction." *Id*; *see also The Boat La Sambra v. Lewis*, 321 F.2d 29 (9th Cir. 1963).

The facts of this case are analogous to *The Francis McDonald*. In 1999 Suda contracted with Charter and its President, Pete Terrebonne to design and prepare plans for the construction of a 600-passenger cruise vessel, which eventually became the Belle Amie. (Decl. of Ajay Suda

/ / / / /

in Opp'n to Mot. to Dismiss[3] ("Suda Opp'n Decl.") at 2.)  The cost of these services is not a part of Suda's claim in this action.  (*Id.*)  Subsequently, Charter entered into a contract with Horizon Shipbuilding, Inc. ("Horizon") to construct a vessel based on Suda's plans.  (Decl. of Pete Terrebonne in Opp'n to Pl.'s Mot. to Dismiss[4] ("Terrebonne Opp'n Decl.") at 3.)  Due to construction delays and because Horizon failed to build the hull according to the plans, a dispute arose between Charter and Horizon.  (*Id.*)  The dispute was eventually settled after arbitration and during Horizon's bankruptcy.  (*Id.* at 3-4.)  Under the final settlement agreement, Horizon sold the partially-constructed Belle Amie to Charter for $100,000.  (*Id.* at 4.)  At the time of the dispute "and thereafter, the primary hull structure including the main deck was completed."  (*Id.* at 3.)  Charter "received title to an intact hull, afloat at the Horizon facility at Bayou La Batre, Alabama."  (*Id.* at 4; Suda Opp'n Decl. at 3.)

Charter had the Belle Amie towed to the Bollinger Shipyard ("Bollinger") in La Rose, Louisiana.  (Terrebonne Opp'n Decl. at 4, 6.)  Suda determined that construction errors at Horizon made it unlikely to complete the Belle Amie as initially planned.  (Suda Opp'n Decl. at 3; *see also* Terrebonne Opp'n Decl. at 4-5.)  Charter contracted with Bollinger, Suda and others to retrofit and alter the Belle Amie to make it a passenger cruise vessel despite Horizon's errors.  (Terrebonne Opp'n Decl. at 5.)  Suda performed the re-design and engineering work, calculations and testing with a view to eventually obtaining Coast Guard approval for 340 passengers.  (*Id.* at 6; *see also* Suda Opp'n Decl. at 3-4.)

Based on *The Francis McDonald*, Caterpillar argues that Suda's services were rendered for the Belle Amie's construction, and therefore could not give rise to a maritime lien.  In support of its argument, Caterpillar filed declarations of Michael E. Thompson, Customer Service Manager with Caterpillar's American Marine Division.  (*See* Aff. of Michael E. Thompson in Supp. of Mot. to Dismiss, dated Dec. 11, 2007 ("Thompson Decl.") at 2; Aff. of Michael E. Thompson in Opp'n to Suda's Mtn. for Partial Summ. J., dated Mar. 3, 2008

---

[3]  This declaration is the same as Mr. Suda's declaration filed in support of his motion for summary judgment.

[4]  This declaration is the same as Mr. Terrebonne's declaration filed in support of Suda's motion for summary judgment.

("Thompson Opp'n Decl.") at 2.)[5] His declarations include a number of exhibits pertinent to Charter's construction financing of the Belle Amie with Caterpillar. Suda objected to every paragraph and exhibit of Mr. Thompson's declarations based on hearsay, foundation, authentication and other grounds, although Mr. Thompson's statements and exhibits are consistent with Suda's evidence.[6] Upon consideration of Suda's objections,[7] the court took into account only those exhibits or portions of exhibits as to which it found the objections without merit.

According to Caterpillar's evidence, Charter contracted with Bollinger to, among other things, "fabricate and install the superstructure, install propulsion and ship's service machinery system on the unfinished Horizon Shipbuilding Hull No. 035, to be named BELLE AMIE" based on Suda's drawings and specifications. (Thompson Decl. Ex. 8; *see also* Terrebonne Opp'n Decl. at 5, 4 (received a hull from Horizon).) Charter's evidence shows that Suda's services were rendered in furtherance of Belle Amie's construction.

Suda argues, as did the defendant in *The Francis McDonald*, that there is a difference between a contract for the complete construction of a ship and one to finish the construction after the vessel had been launched and was water-borne. *See The Francis McDonald*, 254 U.S. at 243-44. The court in *Francis McDonald* disagreed and held that "agreements made after the hull is in the water, for the work and material necessary to consummate a partial construction and bring the vessel into condition to function as intended" were nonmaritime and therefore insufficient to support a maritime lien. *Id.* at 244. Accordingly, the fact that the construction process was interrupted and the Belle Amie towed from Alabama to Louisiana does not alter the analysis.

/ / / / /

---

[5] Although these declarations are very similar, they are not identical.

[6] Mr. Terrebonne's declaration appears to be based on the same documents; however, Suda did not provide the referenced documents to the court. (*See* Terrebonne Opp'n Decl. at 2.)

[7] Only admissible evidence may be considered in deciding a motion for summary judgment. Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

Suda further contends that the Belle Amie "essentially became a barge," and therefore a "vessel" under maritime law, when it was towed from Alabama to Louisiana, and that Suda's services in Louisiana were provided to modify the barge into a dinner cruise vessel. (Suda's Opp'n Mem. of P. & A. at 17; Suda's Mem. of P. & A. in Supp. of Mot. for Partial Summ. J. at 14.)

The lead case in support of Suda's argument is *New Bedford Dry Dock Co. v. Purdy*, 258 U.S. 96 (1922) ("*The Jack-o-Lantern*"). In *The Jack-o-Lantern,* the claimant purchased a car float and contracted with the plaintiff to convert it to a steamer to be used for entertainment purposes. *Id*. at 98. The plaintiff made significant changes to the car float, including removing tracks, re-laying the deck to make a dance floor, constructing a large superstructure to enclose most of the deck and contain a dance hall, rooms and balconies. *Id*. A third-party contractor subsequently installed the engine and boilers. *Id*. The only thing remaining from the original car float after the remodel was the hull. *Id*. at 99. The court applied the rule that while original vessel construction was not the subject of maritime contracts, vessel repairs were. *Id*. "[I]f any considerable part of the hull and skeleton of an old vessel in its intact condition, without being broken up, is built upon, the law holds that in such a case it is the old vessel rebuilt, and not a new vessel." *Id*. at 100. The court held that the plaintiff's services were provided to rebuild the vessel and not for vessel construction, and therefore it had admiralty jurisdiction to enforce the plaintiff's lien.

To bring its claim under *The Jack-o-Lantern*, Suda must show that the Belle Amie was a barge before it was converted into a passenger cruise vessel. In support of its argument, Suda offers declarations of Messrs. Terrebonne and Koch as well as his own. However, none of these declarations state that the Belle Amie was actually used as a barge.

"After [he] received title to and possession of the vessel," Mr. Terrebonne was "considering using the vessel as a barge for transport of cargo and equipment on the bayous." (Terrebonne Opp'n Decl. at 5.) He stated that the Belle Amie was inspected to determine [its] suitability for navigating through inland and coastal waters from Bayou La Batre[, Alabama] to La Rose, Louisiana," was determined to be "entirely suitable for this purpose," and was towed

from Alabama to Louisiana with a small cargo of steel.  (*Id.* at 4; *see also id.* at 6.)  Mr. Terrebonne did not state whether the small cargo constituted anything other than materials necessary to complete the construction of the Belle Amie as a passenger cruise vessel and whether the trip from Alabama to Louisiana was for any purpose other than in furtherance of completing the construction process.  Moreover, he did not state that after his consideration of the issue and finding the Belle Amie suitable, he in fact used it as a barge.

Mr. Suda's declaration does not provide any additional support for the barge argument.  He "performed stability calculations . . . prior to the towing of [the Belle Amie] from Alabama to Louisiana to ensure the Coast Guard would approve [it] to be used as an unmanned barge operating on protected waters."  (Suda Opp'n Decl. at 3.)  He does not state whether the Coast Guard approval was obtained or even sought.  At the Bollinger shipyard in Louisiana, he discussed the option of "simply contnu[ing] to use the [Belle Amie] as an unmanned barge."  (*Id.*)  However, he does not offer any support for the suggestion that the Belle Amie was ever used as a barge in the first place.

Mr. Koch, a marine consultant and surveyor examined the Belle Amie for valuation purposes during Charter's dispute with Horizon.  (Koch Decl. at 2.)  He opined that the Belle Amie "was fully capable of being used as a non-self propelled means of transportation on water."  (*Id.* at 3.)  However, Mr. Koch, who examined the Belle Amie some two years before it was towed, did not, and could not, state that it was ever used as a barge.

Charter had consistently represented the Belle Amie to be a passenger cruise vessel and not a barge.  "From 1991 to 2007 Charter was engaged in the ownership and operation of vessels carrying passengers for hire."  (Terrebonne Opp'n Decl. at 2.)  In May 1999, prior to entering into a contract with Horizon for construction of a 600-passenger vessel, Mr. Terrebonne represented to Caterpillar, for purposes of Charter's financing application, that he was in the business of yacht charters and dinner cruises.  (Thompson Decl. Ex. 1; *see also* Terrebonne Opp'n Decl. at 3; Thompson Decl. Ex. 4 (steel hulled dinner cruise vessel).  On September 6, 2001, after the arbitration between Charter and Horizon, Charter and Caterpillar signed a commitment letter whereby Caterpillar would finance Charter's acquisition of a new 135ft.

dinner cruise vessel.  (Thompson Opp'n Decl. Ex. 15; *see also id*. Ex. 4 (arbitration award dated May 21, 2001).)  In September 2002, Charter finally settled with Horizon.  (Terrebonne Opp'n Decl. at 4; Suda Opp'n Decl. at 3.)  Shortly thereafter, the Belle Amie was towed to Louisiana and arrived at the Bollinger shipyard in the fall of 2002.  (*See* Terrebonne Opp'n Decl. at 4.)  In early December 2002, Charter negotiated with Bollinger for the completion of the Belle Amie.  (*See* Terrebonne Opp'n Decl. at 5; Thompson Decl. Ex. 7.)  On December 26, 2002, Caterpillar and Charter renewed the commitment letter, referring to the 135 ft. dinner cruise vessel as the Belle Amie to be built by Bollinger.  (Thompson Opp'n Decl. Ex. 16.)  On January 21, 2003, Bollinger and Charter entered into an Agreement for Shipyard Services to complete the Belle Amie.  (Thompson Decl. Ex. 8; *see also* Terrebonne Opp'n Decl. at 5, 4 (received a hull from Horizon).)

The evidence does not support Suda's assertion that the Belle Amie was a barge before it became a passenger cruise vessel.  It shows that the Belle Amie's towing from the Horizon shipyard to the Bollinger shipyard was incidental to completing the construction process of the Belle Amie as a passenger cruise vessel.  As in this case, in *The Francis McDonald*, the hull was towed from one shipyard to another with construction materials on board.  *The Francis McDonald*, 254 U.S. at 243 ("[A]ppellant agreed with the owner to complete the work and for such purpose the hull was towed to its yard . . .. . . .  When [the schooner was] received by appellant . . . the bolts and beams and gaff were lying on deck . . ..").)  Nevertheless, the court found that the vessel was still under construction when it arrived to the plaintiff's shipyard.  Suda's theory that the Belle Amie was a barge before it became a passenger cruise vessel is not based on evidence, but on argument.  This is insufficient to oppose Caterpillar's motion or support its own motion for summary adjudication.

Based on the foregoing, there is no genuine issue of fact whether the Belle Amie was a vessel when Suda rendered its services.  Suda therefore cannot show that it had a necessaries lien pursuant to the Maritime Lien Act.  For the same reason, the court need not consider the remaining elements necessary to establish the lien.

/ / / / /

Accordingly, Caterpillar's motion for summary adjudication of Suda's first cause of action for a maritime lien is **GRANTED**. Suda's cross-motion for summary adjudication of the same cause of action is **DENIED**. Caterpillar's request for attorneys' fees is **DENIED**.

**IT IS SO ORDERED.**

DATED: August 6, 2008

_____
M. James Lorenz
United States District Court Judge

COPY TO:

HON. NITA L. STORMES
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL